IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 5, 2024

**STATE OF TENNESSEE v. PHENNIX GIVENS**

**Appeal from the Criminal Court for Shelby County
Nos. C2000750, 20-00413  Chris Craft, Judge**

_____

**No. W2023-00633-CCA-R3-CD**

_____

A Shelby County jury convicted Defendant, Phennix Givens, of three counts of especially aggravated kidnapping, one count of aggravated rape, two counts of aggravated assault, and one count of aggravated cruelty to animals. The trial court sentenced Defendant to an effective forty-six-year sentence. Defendant appeals, arguing that the evidence was insufficient to support his convictions and that the trial court abused its discretion in imposing consecutive sentencing. Following our review of the entire record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Paul K. Guibao (on appeal); John Dolan (at trial), Memphis, Tennessee, for the appellant, Phennix Givens.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Steve J. Mulroy, District Attorney General; and Devon Dennis and Paige Munn, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On May 21, 2019, fourteen-year-old A.L. and her seventeen-year-old boyfriend, D.L., were walking toward the Save-A-Lot parking lot around 2:00 a.m., when an unknown man, later identified as Defendant, approached them and asked if they wanted to make

some money.[1] A.L. was suspicious and did not want to go with Defendant but D.L. wanted to make money. Defendant led them to his house, and D.L. followed Defendant inside and helped him move some air conditioners. A.L. waited outside.

When they did not return for a "little while," A.L. went inside the house. Once she was inside, Defendant shut and locked the door. Defendant pulled a knife "from behind his backpack on the counter" and made her and D.L. go into the bathroom. A.L. identified the knife at trial. Once in the bathroom, Defendant made D.L. get in the bathtub and remove all of his clothing except his underwear. A.L. was forced to remove all of her clothing. A.L. testified that Defendant then attempted to rape her on the bathroom floor, but he was unsuccessful because she resisted. Defendant moved the knife between A.L. and D.L., and forced A.L. to sit on the toilet and perform oral sex on him. Defendant put the knife to A.L.'s throat and forced her to go to his bedroom, leaving D.L. lying face down in the bathtub.

Defendant forced A.L. onto the bed and put the knife on the bed beside her. Defendant then vaginally raped A.L. for about "[ten] or [fifteen] minutes." A.L. recalled that it "felt weird and it hurt[]" when he stuck his penis inside her. A.L. did not consent to the sexual activity. She was worried that when Defendant finished raping her, he would kill her and D.L. A.L. had not been sexually active prior to the assault. She bled from the rape and Defendant brought D.L. from the bathroom and made him look at the blood on the bed. A.L. felt that Defendant was "bragging" about it to D.L.

Defendant forced A.L. and D.L. back into the bathroom where he made A.L. tie D.L.'s wrists with a "charger cord." A.L. tied D.L.'s wrists loosely so he could get out. Defendant took A.L. to the kitchen and made her cook for him. Defendant then gave A.L. and D.L. clothes that were not theirs, and they sat in the living room before returning to the kitchen to clean up. A.L. looked for a way to escape, but when Defendant noticed her looking around, he hit her on the head with the knife.

Defendant, A.L., and D.L. went to a "dog room" where there was a pit bull dog and a cat. Defendant made A.L. clean up animal feces with a towel then forced her to put the towel in D.L.'s mouth. Defendant also forced D.L. to eat dog feces. When Defendant told A.L. to throw the towel outside, A.L. thought she could escape, but she did not because she feared if she left, Defendant would kill D.L. A.L. left the door open slightly so that when she and D.L. could escape, they "could just swing it open and just run out."

---

[1] Because it is the policy of this court to protect the identity of minor victims, we will identify them by their initials.

Defendant made A.L. and D.L. cut each other's hair. They went to the living room, and Defendant showed A.L. "a random picture of a female[,]" and he told her it was her sister and that her family was not her real family. A.L. was confused and "didn't know what he was talking about so [she went] along with it just shaking [her] head and not saying a word." A.L. denied recognizing any of the people in the photographs.

Defendant then took A.L. and D.L. to another room, told them it would be their room, and made them clean it. A.L. continued to look for a way to escape. Defendant returned and took them back to the dog room. A.L. was standing, but D.L. and Defendant sat on the bed. Defendant talked to D.L. about a tattoo Defendant had behind his ear, which Defendant said represented his affiliation with a gang. Defendant asked D.L. about the tattoo, and threatened to stab D.L. if he answered incorrectly. Even though D.L. answered questions about the tattoo, Defendant stabbed D.L. and threatened to stab him again if he got "any blood on his sheets." A.L. thought Defendant stabbed D.L. in the left leg, but she was not sure because she had backed "up all the way in the closet and started crying and covering [her] eyes up, because [she] didn't want to see it." A.L. recalled that Defendant "look[ed] at the knife like he was proud of it. It's like he was attached to the knife." Defendant made A.L. wrap a towel around D.L.'s leg to contain the blood.

Defendant tried to force the dog to bite D.L. When the dog did not bite him, Defendant wiped the blood off D.L.'s leg and put it in the dog's mouth. Defendant then pulled the stairs to the attic down and forced D.L. into the attic. Defendant left the attic stairs down. Defendant and A.L. went into the kitchen, but when Defendant noticed she was tired he forced her to go to the bedroom to sleep. A.L. did not want to go to the bedroom but felt she had no choice because Defendant still had the knife.

A.L. fell asleep "for a minute," and when she woke up, Defendant was asleep, so she went to the bathroom. When she realized Defendant had not noticed she was gone, she "flushed the toilet just to make sure," then "creeped over there to him, and [she] picked [up] his hand and . . . his hand drop[ped] down really fast so [she] knew he was asleep." A.L. "tiptoe[d] out of his room backwards" until she got to the attic stairs, and she called to D.L. Once D.L. was downstairs, A.L. pushed him in front of her, swung the door open, and they ran until they reached the Save-A-Lot parking lot and saw a police officer.

A.L. was holding up D.L. because he could not stand, and she told the officer that they had been kidnapped and she had been raped. A.L. tried to call her mother, but she did not answer, so she called her grandmother instead. When more officers arrived, A.L. told them how to get to Defendant's house and the officers went there.

A.L. was transported to Le Bonheur Children's Hospital, and doctors removed a piece of glass from her foot that she had stepped on when she and D.L. had escaped. A.L.

identified a photograph that showed the blue shorts and pink tank top Defendant had given her to wear. A.L. went from Le Bonheur to the Rape Crisis Center where she agreed to have a sexual assault examination.

A.L. stated that it was "around at least 6:00" p.m. when she left the Rape Crisis Center and went to the Memphis Police Department ("MPD") office. A.L. gave a signed statement and identified Defendant in a photographic lineup, which was admitted into evidence. A.L. circled Defendant's picture in the lineup, signed the lineup and wrote that the identified individual had raped her. A.L. also identified Defendant in court.

A.L. identified multiple photographs of Defendant's house. In the photographs, the house and contents were burned; A.L. testified that the house was not burned when she was there. The photographs were admitted into evidence, and A.L. explained the layout of the house by reference to the photographs. A.L. identified a photograph of the bathroom in Defendant's room and recalled that at one point she snuck out of the bedroom to get D.L.'s phone and called her mother to let her know what had happened and tell her to call 911. Her mother answered the call, but hung up because she did not believe A.L. Before A.L. could call her back to leave a voicemail, she heard Defendant's footsteps and hid the phone. A.L. stated that they first encountered Defendant around 2:00 a.m., and approximated that they escaped "around 8:00, 9:00ish" in the morning because it was "just [] becoming daytime[.]"

On cross-examination, A.L. said that her memory has always been "very good, very specific." On direct examination, A.L. had testified that her mother kicked her out of the house because she had sneaked D.L. into her mother's house. Defense counsel asked A.L. whether her sneaking D.L. into her mother's house without permission was against her mother's rules and an act of deception. A.L. agreed that she had deceived her mother to get D.L. into the house. A.L. stated that she knew the difference between the truth and a lie, and she had told the truth during her direct examination. Defense counsel questioned A.L. on inconsistencies in her testimony.

A.L. agreed that it was not normal for her to be in the Save-A-Lot parking lot around 2:00 a.m. with D.L. A.L.'s "alarm bells" went off when Defendant approached them, but she did not know where they were walking to and was concerned about D.L.'s safety if she walked away. A.L. agreed that Defendant did not have a knife in the parking lot; he had grabbed the knife off the kitchen counter from behind the backpack after they went into the house. She also agreed that she followed Defendant into the bedroom because "he had a knife and he might turn it around and come and attack" her.

Defense counsel questioned whether A.L. remembered testifying that Defendant had the knife the entire time during the rape. A.L. clarified that the knife was on the bed,

- 4 -

not in Defendant's hand, during the rape but "it was an easy grab" because it was next to her on the bed. She denied that she was being deceptive and explained that Defendant placed the knife on the dresser after he raped her. A.L. also explained that after D.L. ate the dog feces, Defendant made her untie D.L. so he could put clothes on. D.L. was untied when Defendant forced him into the attic. A.L. denied telling anyone that D.L. was tied up with duct tape. A.L. explained that after Defendant fell asleep she was able to get out of the bed without disturbing him because there was space between the bed and the wall for her to walk. On redirect examination, the State introduced a photograph that showed the space between the bed and the wall. A.L. explained that she went to therapy after this incident and "tried to forget everything[,]" but now that she was testifying "everything was coming back piece by piece."

D.L. testified that around midnight on May 21, when he and A.L. were walking toward the Save-A-Lot parking lot, they saw an unknown man, whom he identified in court as Defendant. Defendant asked them if they wanted to make some money, but did not specify how they would make the money. D.L. said yes, and they followed Defendant. D.L. recalled that Defendant was pushing a Family Dollar shopping cart with air conditioners in it. D.L. helped Defendant move the air conditioners, but instead of paying D.L., Defendant locked him and A.L. inside the house.

According to D.L., Defendant got a knife from a "drawer in the kitchen counter[,]" held the knife to D.L.'s neck and forced D.L. and A.L. to go into the bathroom. Defendant made D.L. get into the bathtub and remove his clothing, except for his underwear. Defendant made A.L. tie D.L.'s arms behind his back with a "window screen[][,]" and D.L. was face down in the bathtub. While in the bathtub, Defendant told D.L. not to look at him.

D.L. recalled that Defendant put hand soap on his penis and vaginally raped A.L. on the bathroom floor. A photograph of the hand soap was admitted into evidence. D.L. did not witness any other sexual acts. D.L. explained that A.L. appeared scared, was crying, and said wanted to go home. A.L. and Defendant left the bathroom, but D.L. remained face down in the bathtub until Defendant got him out, and they went to the kitchen. In the kitchen, Defendant made D.L. eat dog feces and put a towel with maggots in his mouth. Defendant tried to make the dog bite D.L., but the dog did not bite him.

Defendant forced A.L. and D.L. to go to a bedroom and wanted D.L. to "read a gang sign on his neck." D.L. recalled that Defendant said he had a Gangster Disciple tattoo on his neck, but the tattoo was actually a "74 on his stars." Defendant made D.L. read the tattoo; when he did, Defendant threatened to stab D.L. in his chest. D.L. was scared and read the tattoo again. Defendant stabbed D.L. in his right thigh and threatened to stab him again if D.L. got blood on his sheets. Defendant told A.L. to get a towel to wrap around

D.L.'s thigh. D.L. stated that he and A.L. were dressed at this point, but the clothes were not the clothes they had been wearing earlier.

Defendant, A.L., and D.L. went to the dog room and all sat on the floor. Defendant started asking D.L. "weird questions." Defendant asked A.L. how she met D.L. While A.L. answered the question, D.L. thought that Defendant acted jealous by making "kind of strange facial expressions" and staring at D.L.

Defendant then tied D.L. up again, pulled the stairs to the attic down, made D.L. go up in the attic, and left the stairs down. D.L. stayed in the attic until A.L. woke him up. D.L. thought that he had been asleep for about thirty minutes. When A.L. woke him up and he got down the stairs, he "hopp[ed] on one leg, because [his] right leg was still in pain. It was still bleeding from the stab wound." D.L. stated that he could not have escaped without A.L. Once out of the house, A.L. and D.L. ran across the parking lot and A.L. ran inside Save-A-Lot to get some help. D.L. stated that they were able to flag down help from a security officer who worked at D.L.'s school.

D.L. identified a photograph of the Save-A-Lot parking lot which showed police cars and the clothes he had on when they escaped from Defendant's house. D.L. identified a long sleeve Superman shirt, purple pajama pants, and a yellow belt that Defendant "[w]hooped" him with. D.L. also stated that Defendant hit him on the back of his head with the handle of the knife.

D.L. was transported by ambulance to the Regional One Medical Center[2] where he received "about five or six" stitches in his leg. D.L. identified photographs taken of him in the hospital. In one photograph, D.L. had short hair, was dressed in a purple shirt, and the stitched wound on his leg was visible. D.L. stated that Defendant had given him the shirt to wear. D.L. noted that he had a "fro" when he went to Defendant's house that night, but Defendant made A.L. cut it with scissors. D.L. stated that he still had a scar from the wound and that it "always" bothered him, even when he was at work. He explained that when he rubs his leg "it will have a little tapping - - like somebody - - somebody [was] tapping on [his] thigh[.]"

D.L. went to the crime scene after the hospital, and he told the officers what had happened there. D.L. identified Defendant from a photographic lineup the police showed him and it was the same man A.L. identified in her photographic lineup. D.L. signed the photographic line up and wrote on the bottom of the page "raping my girlfriend, stabbing me and holding me."

---

[2] Many witnesses refer to the Regional One Medical Center as "the MED." It appears from the Officer Henry Hearns' testimony that the MED is the Regional One Medical Center.

D.L. identified a photograph of a deceased white dog as the dog that he saw in Defendant's house and stated that the dog was alive when D.L. saw him. D.L. identified a knife that appeared to be the same knife Defendant used to stab him.

On cross-examination, D.L. explained that he and A.L. were walking to his mother's house the night they encountered Defendant. D.L. denied that Defendant had promised to give him anything other than money and denied that there was any discussion about how D.L. would earn the money. D.L. stated that Defendant did not have the knife with him when they saw him in the parking lot and agreed that it sounded "kind of strange" in retrospect that he followed an unknown man to help him move air conditioners in the middle of the night. D.L. affirmed that he was tied up with a window screen and denied ever being tied up with a phone cord or duct tape. D.L. explained that he was still tied up when A.L. got him out of the attic and that he used his left leg to get down the stairs.

Larry Kincaid testified that in May 2019 he was employed by Shelby County Schools as a school security officer. Mr. Kincaid was "leaving Save-A-Lot when two young people ran up to [him], and the female got to [him] first. And she said . . . she had been kidnapped, and . . . she escaped, whatever, and the young man was behind her . . . because he was kind of limping." He described the female as "dead serious" and "frightened." Mr. Kincaid looked at the male's leg and saw blood and "knew it was serious" so he told them to follow him to his car and immediately called for help. MPD and Shelby County Schools officers got to the Save-A-Lot within four minutes.

MPD Officer Robert Spradley testified that he heard the call for help and arrived at the Save-A-Lot parking lot around "lunchtime" or between 11:00 a.m. and 1:00 p.m. Officer Spradley was a part of the "Old Allen Task Force" which looked for violent felons. He talked to A.L. who was seated in the back of a police car. He described her as "very upset" while she described what had happened to her and tried to recall from which direction she had run. Officer Spradley used the map on his phone to show A.L. where they were located, and she picked the house out. Officer Spradley wore a body camera; the footage showing A.L. giving him directions on his phone was played for the jury. Officer Spradley then left the Save-A-Lot parking lot and went to Defendant's house.

Officer Spradley waited for other officers in his task force to arrive at Defendant's house before he attempted to make contact. Once they arrived, the officers knocked on the side door and saw Defendant walk toward the door with "a knife in one hand, and . . . a [Rubbermaid] tote in the other hand." Officer Spradley broke a window, and Defendant threw the knife out of the broken window at the officers and then "retreated back to the north side of the house." Officer Spradley identified the knife at trial. He had "tagged" it by placing a sticker signed with his name and employment number. The knife was entered

into evidence.  When Officer Spradley picked up the knife, he noticed that "there appeared to be blood on the end of it, the tip of it."

Soon after Defendant retreated into the house, the officers saw smoke coming out of the broken window.  Officer Spradley could "hear things that were being moved around, but . . . couldn't see anything."  The officers tried to help Defendant climb out of a bathroom window while the house was burning, but Defendant was "not really" responsive to their efforts.  Defendant "kept disappearing back into the window, and [they] couldn't see him because [of] all the smoke.  And . . . then he would pop back out."  Defendant eventually left the house and did not appear to be injured.  Officer Spradley identified Defendant in court.  Officer Spradley denied throwing a "smoke bomb" into the house.

Officer Spradley identified multiple photographs showing the outside of the house as he described the scene to the jury.  One photograph depicted Defendant's backyard and the back of the Save-A-Lot was visible through the trees.  Officer Spradley was not aware of any other people or any animals that were in the house until the Memphis Fire Department ("MFD") carried a dog out of the house.  MFD gave medical attention to the dog, but it did not survive.  A photograph of the deceased dog was admitted into evidence.

MPD Officer Jason Moore responded to Defendant's house and shortly after he arrived, he saw smoke coming from the windows of the house.  Officer Moore estimated that it took Defendant "maybe [ten] minutes" to exit the house.  Officer Moore identified a photograph of "the covering of a dead animal[,]" and stated that MFD brought a dog out of the house after they extinguished the fire.  MFD used an oxygen mask and performed CPR on the dog in an unsuccessful attempt to resuscitate the dog.  Officer Moore denied that any of the officers threw "any smoke bombs or anything like that to try to smoke [Defendant] out."  He said that officers did not carry those items.  On cross-examination, Officer Moore stated that he arrived at the scene "right around lunchtime," between 11:00 a.m. and 1:00 p.m.

MPD Officer Chance Hall also responded to the Save-A-Lot parking lot.  He was not there long because he "started following an ambulance to the hospital with the victim[] in it."  However, he did not make it to the hospital because Officer Spradley called for additional officers to respond to the scene at Defendant's house.  Officer Hall described the scene as "chaotic" when he arrived.  The officers each "picked a corner" and were determining their next course of action when they noticed smoke coming from within the house.  Officer Hall tried to get Defendant out of the house, but he was screaming and uncooperative and "acting erratic."

Once Defendant exited the house, Officer Hall was one of the officers that took him into custody.  He put Defendant in the backseat of his patrol car.  Officer Hall did not read

Defendant his *Miranda* rights because he was not "asking him any questions involving the investigation[,]" and Defendant was speaking with him voluntarily. Officer Hall stated that Defendant spontaneously said that the "little boy was a b**** and the girl was a hero." Officer Hall's body camera captured Defendant's statement. A video with two views, one from Officer Hall's body camera and the other from the backseat of his patrol car, was entered into evidence and played for the jury. The State played small sections of the video at a time because it was difficult to hear. After listening to the video and reviewing his incident report, Officer Hall stated that he "put in the report that [Defendant] said, little girl was the strong one. The boy was a b**** and I'd kill him. She was strong and she was the hero."

Officer Hall affirmed that MFD did not think Defendant needed medical attention, but as a precaution, he was transported to Regional One Medical Center after the scene was secured. Officer Hall denied that any officers threw any object into Defendant's home. He identified Defendant in court as the man he took into custody.

John Morgret with Memphis Animal Services testified as an expert in animal cruelty investigation. Mr. Morgret responded to Defendant's house because MFD found a dog when they responded to the fire. Mr. Morgret identified a photograph of the white dog as the dog he found in the front yard of Defendant's house and noted that the dog "appeared to be a healthy adult male dog. It was obviously deceased at the time, and due to the medical devices around it, it appeared that the fire department had attempted a resuscitation of the dog, but that had . . . been unsuccessful." Mr. Morgret determined that the dog had "most likely died of smoke inhalation" if it was inside the house at the time of the fire because there "no obvious signs of physical trauma."

Sergeant Robert Brown, with MPD's sex crimes unit, was assigned to Defendant's case and had obtained a search warrant for Defendant's house. MPD Officer Tristan Brown, with MPD's crime scene unit, responded with Sergeant Brown to execute the search warrant. Once they entered the house, Officer Brown "[p]hotographed and collected several items, a [lighter] and a few other things, a credit card and papers and stuff." Officer Brown collected the lighter from "the living room, near the front door" and it was entered into evidence. Officer Brown identified a photograph that showed a lifted up mattress with a Visa card and an activation form for a "Region's Malcard" under the mattress. The Visa card had Defendant's name on it, and the activation form had Defendant's name and address on it. Officer Brown stated that the photographs showed the house "just about completely destroyed" and affirmed that was how the house appeared when he executed the search warrant.

Sergeant Brown also obtained a search warrant for Defendant's DNA. Sergeant Brown was present when MPD officer Robert Herring collected Defendant's DNA through

buccal swabs. Sergeant Brown described Defendant as calm at first but then he got irate, hostile, and "started screaming. He started attempting to push the panic alarm . . . inside of the interview room and started reaching for the computer[.]" The officers were able to collect the swabs, and Sergeant Brown affirmed that he left a copy of the search warrant with Defendant.

Phyllis Crump testified as an expert in sexual assault exams. She was the nurse practitioner at the Memphis Sexual Assault Resource Center ("MSARC") who conducted A.L.'s sexual assault exam. Ms. Crump's report from A.L.'s exam was exhibited to her testimony. The report stated that A.L. reported no sexual history, no history of interpersonal violence, and that A.L. consented to all exams done at MSARC. A.L. provided a narrative, which differed slightly from her testimony. The report noted that A.L. had a laceration on the ball of her left foot and that there was a "thick brown discharge from the vaginal cavity" which could indicate a cycle or old blood. She also noted that there were no injuries in the perineum area, which would be consistent with the narrative A.L. provided. Ms. Crump collected a sexual assault kit from A.L. which collected samples from the vaginal area. Ms. Crump recalled that A.L. was "[c]ooperative, kind of soft spoke[n], trying to protect herself . . . because she was kind of holding herself real tight."

Christie Smith, a TBI Special Agent Forensic Scientist, testified as an expert in forensic biology and DNA analysis. Special Agent Smith stated that she prepared two reports in this case, with the first made in December 2019. Special Agent Smith received A.L.'s sexual assault kit, including the swabs and a saliva standard from A.L., A.L.'s pink tank top and sweatpants, and a saliva standard from Defendant. Special Agent Smith's testing of the swabs taken from A.L. confirmed the presence spermatozoa and semen. Testing on A.L.'s sweatpants revealed the presence of semen in two areas, "[o]ne area was on the inside front near the crotch, and the other area was on the inside back near the seat area." For both of those stains, the major DNA profile obtained was consistent with the saliva standard from Defendant. Special Agent Smith explained that "[f]or one stain, the major contributor profile is consistent with [Defendant]. And for the other stain, the inside back, it was a mixture of two people, and those two people are [A.L.] and [Defendant]."

Special Agent Smith's second report, created in February 2023, was created after the State requested further testing on the swabs. Special Agent Smith performed YSTR testing, which "is a specialized type of testing that . . . can target or be able to test just for . . . male DNA." For both swabs taken from A.L., the YSTR profile matched Defendant, meaning that "the DNA profile [she] obtained from the vaginal swabs was the same DNA profile that [was] obtained from the known saliva standard for [Defendant]." Special Agent Smith stated that there was a "decent amount of male DNA in both of those samples."

Christopher Cavitt testified that Defendant was his cellmate in May 2019 at the Shelby County Jail. At the time of trial, Mr. Cavitt was serving an eight-year sentence for aggravated assault. He testified that the State had not offered him anything for his testimony. He admitted he had an extensive criminal history, including multiple thefts. Mr. Cavitt was Defendant's cellmate for a roughly a week and a half when Defendant first came in on the charges in this case. Defendant told Mr. Cavitt that he offered to pay A.L. and D.L. to help him move air conditioners. Once they were in the house he tied up D.L. with a phone charger and made A.L. shower then "performed oral sex on her on the bathroom floor." Defendant then made A.L. move to another location to have sex with her and D.L. came up behind him with a butcher knife in his hand. Defendant and D.L. struggled over the butcher knife, Defendant got cut on the hand, and once Defendant had the knife he stabbed D.L. in the leg and put him in the attic. Mr. Cavitt could tell "by how [Defendant] was talking that [the sex] wasn't consensual[.]" Defendant admitted to making A.L. put dog feces in D.L.'s mouth. Defendant made A.L. make him food, then they went to sleep and when he woke up, D.L. and A.L. were gone.

Mr. Cavitt told Defendant that he was "caught" because the police had DNA. Defendant told him that the police had taken his mattress but "there's not . . . DNA on the mattress" because he had sex with A.L. on the couch. Defendant told Mr. Cavitt that he "burnt the evidence up and tried to . . . get the police to . . . pay attention to the fire rather than him trying to escape out of the house." Defendant told Mr. Cavitt that "he was just going to play crazy" and was taking "psych meds" so he would have the medications in his system if the police performed a blood or urine test. Defendant said he would rather go to "a psych ward versus going to prison." Mr. Cavitt stated that Defendant never denied the charges or claimed that the police had the wrong person. He described Defendant as "completely sane" during this conversation. After their conversation, Mr. Cavitt asked for a cell change because he did not want to be cellmates with Defendant.

At close of the State's proof, Defendant filed motions for judgments of acquittal on all counts. The trial court granted Defendant's motion for judgment of acquittal for arson (count seven) because the State did not prove that there was "someone else with a financial or possessory interest in the building that did not give permission." After a *Momon*[3] colloquy, Defendant chose not to testify and did not present proof.

Based on these facts, the jury convicted Defendant of especially aggravated kidnapping of A.L. accomplished with a deadly weapon (count one), especially aggravated kidnapping of D.L. accomplished with a deadly weapon (count two), especially aggravated kidnapping of D.L. where D.L. suffered serious bodily injury (count three), aggravated

---

[3] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999) (establishing the standard of knowledge a defendant must demonstrate to waive their constitutional right to testify).

rape of A.L. while armed with a weapon (count four), aggravated assault of D.L. by causing D.L. to reasonably fear imminent bodily injury while armed with a deadly weapon (count five), aggravated assault of D.L. by using or displaying a deadly weapon and causing bodily injury to D.L. (count six), and aggravated cruelty to animals (count eight).

On April 13, 2023, the trial court conducted a sentencing hearing. A.L.'s grandmother testified that A.L. tried to harm herself and had panic attacks. "She ha[d] fallen out at school, [and] at work." While A.L. was "a strong lady now. . . . it will never leave her mind[.]" A.L.'s grandmother stated that she had "taken [A.L.] into [her] arms and slept with her at night because of [her] pain and the suffering." She wanted justice for A.L. and for Defendant "to understand that you did something, you violated a person, a little girl[.]"

Defendant testified that he understood that the trial court would sentence him based on certain guidelines. He also agreed that defense counsel strongly advised him against testifying and had informed Defendant that he would not cross-examine A.L.'s grandmother. Defendant stated that he had been incarcerated for five years and had "lost a lot that [he] worked hard for all [his] life.[.]" He stated that he had "been sitting here listening and trying to keep up with the courts where [he had] been made out to be a monster." He stated that he was a "good Christian" who believed in the truth and asserted that he was not guilty of the charges against him. On cross-examination, Defendant denied that the proof against him at trial was overwhelming. He ultimately acknowledged that he was responsible for the stab wound in D.L.'s leg. He asserted that he and A.L. had consensual sex. Defendant claimed that the officers started the fire at his house.

Defendant's presentence report showed multiple misdemeanor convictions and one felony conviction for robbery. Certified copies of Defendant's convictions were entered into evidence. Defendant reported that he had received his GED in 1993. He "rated his mental health as fair" and reported that he had been diagnosed with "schizophrenia, depression, and PTSD at the age of [eleven]." Defendant also reported that he had first consumed alcohol at the age of thirteen, that he had been drinking enough "to pass out on the weekends[,]" and had previously used cocaine, heroin, marijuana, and methamphetamine. Defendant denied that use of those drugs was a crime because "[w]hat [he] does in [his] home is nobody's business but [his]." Defendant's Strong-R assessment resulted in a risk level of "moderate" with high needs in mental health and education, moderate needs in residential, employment, alcohol/drug use, and family, and low needs in attitudes/behaviors, friends, and aggression. Defendant denied remembering any of his prior convictions.

The State argued for the application of several enhancement factors and asked for maximum sentences. The State also argued for consecutive sentencing because Defendant

was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. Defense counsel argued that if Defendant received a twenty-five-year sentence "to be run concurrently with other charges, that would make him in his [seventies] when he became eligible for release. . . . [T]hat would be sufficiently protective of society as a whole and sufficiently punitive to [D]efendant with respect to the crimes charged."

The trial court found that Defendant was a Range I offender and noted that no enhancement factors applied to count eight, aggravated cruelty to animals. The trial court applied five enhancement factors to the remaining counts: that Defendant had criminal history in addition to the convictions necessary to establish the appropriate range; that Defendant treated the victims with exceptional cruelty during the commission of the offense; that the offense involved a victim and was committed to gratify Defendant's desire for pleasure or excitement; that Defendant possessed or employed a deadly weapon; and that Defendant had no hesitation about committing a crime when the risk to human life was high. *See* T.C.A. § 40-35-114(1), (5), (7), (9) and (10). The trial court declined to apply enhancement factor four, that the victims were especially vulnerable because of their age, finding that they were vulnerable, but "not particularly vulnerable." The trial court found no mitigating factors, noting that although Defendant "had some mental issues in the past," at the time of the crimes, he was "thinking very clearly, was not under any mental disturbance that I can tell although these are weird, strange crimes."

Regarding the alignment of the sentences, the trial court found that Defendant was a dangerous offender whose behavior indicated little or no regard for human life and he had no hesitation about committing a crime in which the risk to human life was high, that the circumstances surrounding the commission of the offenses were aggravated, that confinement was necessary to protect society from Defendant's unwillingness to lead a productive life, and that Defendant had resorted to criminal activity in furtherance of an anti-societal lifestyle. *See* T.C.A. § 40-35-115. Regarding whether the aggregate length of the sentence reasonably related to the Defendant's convictions, the trial court noted that Defendant was "an extremely, extremely dangerous man" who "den[ied] reality" during his testimony. The trial court imposed consecutive sentencing stating:

> [N]ot because we have two victims at the same time that were kidnapped with a knife at the same time. It's because of the hours they were kept captive and the individual crimes, twisted crimes that he committed on each one while the other watched. They were separate crimes. The aggravated kidnapping happened at one time as to each one but they were separate crimes committed on them while they were being kidnapped. It wasn't just the knife. It was while they were continuing to be held at knife point and the

different things that he made them do, that he's an extremely dangerous man[.]

The trial court sentenced Defendant to twenty-three years each for counts one through four, five years for counts five and six, which were merged, and one year for count eight. The trial court ordered counts one, four and eight to run concurrently with each other, and counts two, three, five, and six to be served concurrently with each other, but consecutively to counts one and four, for an effective forty-year sentence.

The trial court denied Defendant's motion for new trial on June 20, 2023. Defendant filed a premature pro se notice of appeal, which this court deemed timely. Defendant's appeal is now properly before this court.

## Analysis

On appeal, Defendant argues that the evidence was insufficient to support his convictions and that the trial court erred in imposing consecutive sentences. The State argues that the evidence was sufficient to support Defendant's convictions and that the trial court properly exercised its discretion in sentencing Defendant. We agree with the State.

*Sufficiency of the Evidence*

When evaluating the sufficiency of the evidence on appeal, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quotations omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *see* Tenn. R. App. P. 13(e). The standard of review is the same whether a conviction is based on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." *State v. Shackleford*, 673 S.W.3d 243, 250 (Tenn. 2023) (quotations omitted) (quoting *Hanson*, 279 S.W.3d at 275). Further, the State is afforded "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011) (quotations omitted) (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)).

The jury evaluates the credibility of the witnesses, determines the weight to be given to witnesses' testimony, and reconciles all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.

Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence. *Dorantes*, 331 S.W.3d at 379. A guilty verdict "accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997) (citing *State v. Grace*, 493 S.W.3d 474, 476 (Tenn. 1973)). This court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." *Wagner*, 382 S.W.3d at 297 (citing *Bland*, 958 S.W.2d at 659).

Defendant asserts that A.L.'s and D.L.'s testimonies "simply cannot co-exist in the same truthful reality" and the "material inconsistencies should have led a rational trier of fact to have found reasonable doubt to exist." However, "it is the jury's function to weigh the credibility of the witnesses and to resolve the factual conflicts in the evidence. Our task is to review the legal sufficiency of the evidence under the standards stated above." *State v. Reid*, 164 S.W.3d 286, 311 (Tenn. 2005). By returning guilty verdicts, the jury resolved any discrepancies between A.L.'s and D.L.'s testimonies in favor of the State's theory. *See Bland*, 958 S.W.2d at 659. We note that while there are some inconsistencies between A.L.'s and D.L.'s testimonies, such inconsistencies are not material to the events that establish the elements of Defendant's convictions.

"Especially aggravated kidnapping is false imprisonment . . . [a]ccomplished with a deadly weapon or . . . [w]here the victim suffers serious bodily injury." T.C.A. § 39-13-305(a). False imprisonment occurs when "[a] person . . . knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* § 39-13-302(a). Removal or confinement is unlawful when it "is accomplished by force, threat or fraud[.]" *Id.* § 39-13-301(15). This court has held "that removal or confinement may initially be with the consent of a victim, yet subsequently become unlawful and against the will of a victim." *State v. Coleman*, No. W2021-01021-CCA-R3-CD, 2002 WL 31625009, at *6 (Tenn. Crim. App. Nov. 7, 2002). Serious bodily injury includes, among other injuries, extreme physical pain and protracted or obvious disfigurement. T.C.A. § 39-11-106(a)(36).[4]

When viewed in the light most favorable to the State, the evidence at trial showed that Defendant encountered A.L. and D.L. in the Save-A-Lot parking lot between midnight and two in the morning. He offered them money to help him move air conditioners and asked them to follow him to his house. Once A.L. and D.L. were in his house, Defendant brandished a knife and would not let them leave. Both victims identified the knife at trial. While they were confined to his house, Defendant threatened both A.L. and D.L. with the

---

[4] We note that T.C.A. § 39-11-106 has since been amended and serious bodily injury is defined in subsection (a)(37).

knife, and in fact stabbed D.L. in the thigh. D.L.'s wound required stitches and he had a scar that continued to bother him at the time of trial, approximately four years after the offense date. *See State v. Reece*, No. M2011-01556-CCA-R3-CD, 2013 WL 1089097, at *14 (Tenn. Crim. App. Mar. 14, 2013) (noting that this court has recognized that a scar satisfies the requirement for "protracted or obvious disfigurement"); *State v. Wright*, No. M2006-02343-CCA-R3-CD, 2008 WL 371258, at *7 (Tenn. Crim. App. Feb. 11, 2008) (finding serious bodily injury where the victim required five stitches to close a wound, eight stitches to close another wound, and had scars from each). The evidence was sufficient to support the jury's finding that Defendant committed especially aggravated kidnapping of A.L. and D.L. when he used a knife to confine them (counts one and two) and when he confined D.L. and caused him serious bodily injury by stabbing him in the leg (count three).

"Aggravated rape is unlawful sexual penetration of a victim by the defendant" when "[f]orce or coercion is used to accomplish the act and the defendant is armed with a weapon[.]" T.C.A. § 39-13-502. At the close of its proof, the State elected to have the jury consider "the alleged act of aggravated rape when [Defendant] penetrated [A.L.] vaginally with his penis on his bed." A.L. testified that after Defendant made her remove her clothing in the bathroom, he put a knife to her throat and forced her to go into his bedroom. In the bedroom, Defendant vaginally raped A.L. at knifepoint on his bed. A.L. testified that she did not consent for Defendant to have sex with her. Special Agent Smith testified that Defendant's DNA matched the sperm found on the sweatpants A.L. was wearing and the sperm found on the swabs taken from A.L. When viewed in the light most favorable to the State, the evidence was sufficient to support Defendant's conviction for the aggravated rape of A.L.

Aggravated assault is assault that "[i]nvolved the use or display of a deadly weapon[.]" T.C.A. § 39-13-102(a)(1)(A)(iii). An assault occurs when a person "intentionally, knowingly or recklessly causes bodily injury to another" or "intentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(1), (2). The proof showed that Defendant forced D.L. at knifepoint to remove his clothing and lie face down in the bathtub. Defendant also forced D.L. to eat dog feces while wielding the knife against D.L. Later, Defendant forced D.L. to read a tattoo on his neck and threatened to stab D.L. if he got it wrong. D.L. was "scared" he would be stabbed. When D.L. did not read the tattoo to Defendant's satisfaction, Defendant stabbed D.L. in the leg. The evidence clearly supported the jury's determination that Defendant caused D.L. to reasonably fear imminent bodily injury when he threatened him with a knife (count five) and did cause D.L. bodily injury by stabbing him in the leg (count six).

Aggravated cruelty to animals occurs when a person intentionally or knowingly kills, maims, tortures, or burns a companion animal with no justifiable purpose. T.C.A. §

- 16 -

39-14-212(a)(1). A companion animal is any non-livestock animal, which is a "pet normally maintained in or near the household or households of its owner or owners." *Id.* § 39-14-212(b)(2), -201(3). Dogs are companion animals. *State v. Barnett*, No. M2009-00756-CCA-R3-CD, 2010 WL 3822880, at *13 (Tenn. Crim. App. May 20, 2010). The proof at trial established that Defendant intentionally set the house fire. Officers Spradley, Brown, and Moore testified that they noticed smoke coming from inside the house when they were trying to apprehend Defendant. The officers testified that there was no one other than Defendant inside of the house at that time. Officer Brown testified that he found a lighter in the living room. Further, Mr. Cavitt testified that Defendant admitted to setting the fire to destroy evidence and to create a diversion for his escape. All officers testified that they did not throw anything into Defendant's house that could have caused the fire. Both A.L. and D.L. testified that the dog was alive while they were in the house. Mr. Morgret testified that the dog appeared to be a healthy adult male dog and he determined that the dog had died from smoke inhalation. The evidence supports the jury's finding that Defendant committed aggravated cruelty to animals.

*Consecutive Sentencing*

Next, Defendant contends that the trial court erred in ordering partial consecutive sentences because it did not "separate the facts of the instant case from [Defendant]'s history which did not show him to be a dangerous offender." He further argues that because of his age and his mental health history, consecutive sentencing was not reasonably related to the offenses committed and not necessary to prevent future societal harm. The State asserts that the trial court properly weighed the factors outlined in *State v. Wilkerson*, 905 S.W.2d 933 (Tenn. 1995), prior to imposing partial consecutive sentences. We agree with the State.

This court reviews a trial court's decision to impose consecutive sentences under an abuse of discretion standard, accompanied by a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859-62 (Tenn. 2013); *see State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). This court gives deference "to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" *Pollard*, 432 S.W.3d at 861; *see* Tenn. R. Crim. P. 32(c)(1) ("If the defendant pleads guilty or is convicted in one trial of more than one offense, the trial judge shall determine whether the sentences will be served concurrently or consecutively.").

The trial court may order sentences to run consecutively if it finds by a preponderance of the evidence that the "defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high[.]" T.C.A. § 40-35-115(b)(4). Before imposing

- 17 -

consecutive sentences based upon this classification, the trial court must find that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." *Wilkerson*, 905 S.W.2d at 939; *see Pollard*, 432 S.W.3d at 863 (holding that the *Wilkerson* factors still apply after adoption of the abuse of discretion standard). Additionally, consecutive sentencing is guided by general sentencing principles providing that the length of the sentence be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002) (quoting T.C.A. §§ 40-35-102(1) and -103(2)). On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. T.C.A. § 40-35-401, Sentencing Comm'n Cmts; *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016).

The record clearly reflects the trial court's reasoning for determining that Defendant was a "dangerous offender whose behavior indicate[d] little or no regard for human life and no hesitation about committing a crime in which the risk to human life [was] high." The trial court found that extended confinement was necessary to protect the public because of the aggravated nature of the circumstances of the offenses and Defendant's unwillingness to lead a productive life. The trial court noted that it did not "see a lot of jobs on [Defendant's] presentence report." Further, the trial court found an extended sentence reasonably related to the seriousness of the offenses because Defendant was "an extremely, extremely dangerous man." The trial court explicitly stated that the imposition of consecutive sentences was based on "the hours [that] [the victims] were kept captive and the . . . twisted crimes that he committed on each one while the other watched." It also noted that Defendant continued to "deny[] reality" by asserting that he did not commit the crimes and that he had "lost a lot[.]" The trial court made the requisite findings to support the imposition of consecutive sentencing. Defendant is not entitled to relief.

## Conclusion

For the forgoing reasons, the judgments of the trial court are affirmed.

_____
JILL BARTEE AYERS, JUDGE